UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| ECOLOGICAL RIGHTS FOUNDATION, et al.,<br><br>Plaintiffs,<br><br>v.<br><br>SAN DIEGO GAS & ELECTRIC COMPANY,<br><br>Defendant. | Case No.:  24-cv-1614-RSH-MMP<br><br>**ORDER ENTERING CONSENT DECREE** |

For the reasons stated in its Order on the Parties' joint motion to enter consent decree, the Court **ENTERS** the consent decree attached as "Exhibit A" to this Order. The Court retains jurisdiction of this matter for purposes of enforcing the decree until its termination. The Clerk of Court is directed to close the case.

**IT IS SO ORDERED.**

Dated: October 15, 2024

_____
Hon. Robert S. Huie
United States District Judge

# EXHBIIT A

1    Christopher Sproul (State Bar No. 126398)
     Stuart Wilcox (State Bar No. 327726)
2    ENVIRONMENTAL ADVOCATES
     5135 Anza Street
3    San Francisco, California 94121
     Telephone: (415) 533-3376
4    Facsimile: (415) 358-5695
     Email:  csproul@enviroadvocates.com
5    Email:  wilcox@enviroadvocates.com

6    Fredric Evenson (State Bar No. 198059)
     ECOLOGY LAW CENTER
7    300 H Street
     Arcata, CA 95521
8    Telephone; (707) 845-8888
     Email: evenson@ecologylaw.com

9

     Attorneys for Plaintiffs
10   ECOLOGICAL RIGHTS FOUNDATION
     and SAN DIEGO COASTKEEPER

11

            UNITED STATES DISTRICT COURT
12          SOUTHERN DISTRICT OF CALIFORNIA

13   ECOLOGICAL RIGHTS FOUNDATION and
     SAN DIEGO COASTKEEPER,         Civil Case No. XX
14
           Plaintiffs,            CONSENT DECREE
15
       v.
16
     SAN DIEGO GAS & ELECTRIC COMPANY,
17
          Defendant.
18

19

20

21

22

23

24

25

26

27

28

**RECITALS**

1. This Consent Decree is entered into by and between Plaintiffs Ecological Rights Foundation and San Diego Coastkeeper (collectively "Plaintiffs") and Defendant San Diego Gas & Electric Company ("SDG&E"). Plaintiffs and SDG&E can individually be referred to as a "Party" or collectively, as the "Parties."

2. On or about July 26, 2023, Plaintiffs served SDG&E with a Notice of Violation and Intent to File Suit letter ("Notice Letter") alleging SDG&E's management of wood poles and cross-arms treated with pesticidal wood treatment formulations, as well as its management of wood waste containing pesticidal wood treatment formulations, at seven (7) SDG&E Construction & Operation sites throughout San Diego County has contributed or is contributing to the past or present handling, storage, treatment, transportation or disposal of a solid or hazardous waste that may present an imminent and substantial endangerment to health or the environment in violation of 42 U.S.C. § 6972(a)(1)(B) of the Resource Conservation and Recovery Act ("RCRA"). The Notice Letter also alleges that SDG&E was in violation of the federal Clean Water Act ("CWA") at each of the seven (7) SDG&E Construction & Operation sites because it failed to comply with the substantive and procedural requirements of the CWA and the National Pollutant Discharge Elimination System ("NPDES") General Permit for Storm Water Discharges Associated With Industrial Activities, Order NPDES No. CAS000001, adopted by the California State Water Resources Control Board in Order No. 2014-0057-DWQ, effective July 1, 2015, amended in 2015 (WQ 215-0122-DWQ (effective August 4, 2015)) and 2018 (WQ 2018-0028-DWQ (effective July 1, 2020)) ("Industrial General Storm Water Permit").

3. Plaintiffs represent that they have notified all required entities of the violations it alleges in the Notice Letter, including the State of California and U.S. Environmental Protection Agency, pursuant to 42 U.S.C. § 6972(b) and 33 U.S.C. § 1365(a), by transmitting to them a copy of the Notice Letter.

4. Plaintiffs intend to file a complaint ("Complaint") against SDG&E in the United States District Court for the Southern District of California ("District Court") contemporaneously with this Consent Decree.

1

5. Among other things, Plaintiffs' Complaint alleges that SDG&E has contributed or is contributing to the past or present handling, storage, treatment, transportation or disposal of wastes contaminated with pentachlorophenol and Dioxins (as defined in Section I below), present from the pesticidal wood treatment formulations used on wooden utility poles and cross-arms and present in Treated Wood Waste (as defined in Section I below) generated from the handling and management of such treated wooden utility poles and cross-arms in a manner that may present an imminent and substantial endangerment to health or the environment in violation of 42 U.S.C. § 6972(a)(1)(B) of RCRA.

6. The six (6) SDG&E Construction and Operation sites (the "Facilities") covered by this Consent Decree and included in the Complaint are identified in Exhibit A.  SDG&E represents that the North East Annex Construction and Operation site located at 1700 W. Mission Road, Escondido, California ("North East Annex site"), identified in the Notice Letter, has not stored or managed wood poles, cross-arms, or Treated Wood Waste (as defined in Section I below), treated with pentachlorophenol since at least 2018. As a result of this representation, Plaintiffs have not identified the North East Annex in the Complaint, and the Parties have not included the North East Annex as a location subject to this Consent Decree.

7. SDG&E denies the occurrence of the violations alleged in the Notice Letter and the Complaint and denies that its Facilities (or operations thereon) are causing or otherwise contributing to an imminent and substantial endangerment or are discharging stormwater to waters of the United States in violation of the CWA or that any discharge of stormwater from the Facilities requires coverage under the General Industrial Storm Water Permit. SDG&E does not admit any liability arising out of the allegations or occurrences alleged in the Notice Letter or the Complaint and maintains that it has complied at all times with all applicable provisions of RCRA and the CWA.

8. The Parties enter into this Consent Decree in an effort to efficiently and cost-effectively resolve the Action (as defined in Section I below). The terms in this Consent Decree are negotiated solely for the purpose of this settlement and are not an admission by either Party as to: (i) the applicability of any law or regulation, (ii) the basis for and/or applicability of any Pollutant Action Levels, Facility-specific Pollutant Action Levels or Infiltration BMP Pollutant Actions

Levels (as defined in Section I below) for any purpose other than for use within the scope of this negotiated settlement, (iii) the legal entitlement to, and/or factual basis supporting, any payment made pursuant to this Consent Decree, and/or (iv) any independent legal requirement for the use of any best management practice, sampling technique or frequency, and/or the installation of any infrastructure or deployment of any treatment technologies.

9. Plaintiffs and SDG&E acknowledge that this Consent Decree has been negotiated by the Parties in good faith; will avoid the continued expense, uncertainty, and time of litigation between the Parties; and that this Consent Decree is fair, reasonable, and in the public interest.

**NOW, THEREFORE, IT IS HEREBY STIPULATED BETWEEN THE PARTIES AND ORDERED AND DECREED BY THE COURT AS FOLLOWS:**

I.   **DEFINITIONS**

1.   Whenever the terms listed below are used in this Consent Decree, the definitions below shall apply. To the extent a term with initial capitalization is used in this Consent Decree, but not defined below, the term shall have the meaning provided for in this Consent Decree.

"Action" means the Complaint, Notice Letter (but excluding allegations related to the North East Annex site), and all operative pleadings and orders on file in this matter.

"Business Hours" means 7 AM to 3 PM Monday through Friday but excluding Federal, State of California, or SDG&E company holidays.  SDG&E may, in its sole discretion, elect to collect any samples required to be taken during "Business Hours" at an alternative time other than between 7 AM and 3 PM.

"BMP" means best management practice.  "BMPs" means best management practices.

"Consent Decree" means this Consent Decree and any Exhibits or documents incorporated by reference.

"Day" means a calendar day. In computing any period of time under this Consent Decree, where the last day of such period is a Saturday, Sunday, or Federal, State of California, or SDG&E company holiday, the period runs until the close of business on the next day that is not a Saturday, Sunday, or Federal, State, or SDG&E company holiday.

"Design Storm" means the basis for sizing a BMP to maintain the effective capacity to

2

capture and treat, send to the sewer, infiltrate, and/or evapotranspire the volume of runoff produced up to and during the 85th percentile 24-hour precipitation event based upon local, historical precipitation data and records.

"Dioxins" means polychlorinated dibenzo-p-dioxins and polychlorinated dibenzofurans.

"Dioxins TEQ" means the value for all polychlorinated dibenzo-p-dioxins and polychlorinated dibenzofurans congeners calculated according to World Health Organization 2005 Toxic Equivalency Factors and the Bioaccumulation Equivalency Factors according to the March 1995 Great Lakes Water Quality Initiative for all purposes except for the Infiltration BMP Pollutant Action Levels (as defined in this Section I below). For purposes of the Infiltration BMP Pollutant Action Levels, the Dioxins TEA means all polychlorinated dibenzo-p-dioxins and polychlorinated dibenzofurans congeners calculated according to World Health Organization 2005 Toxic Equivalency Factors only.

"Dry Season" means the five-month period beginning May 1st of any given year and ending September 30th of the same year.

"Effective Date" means the effective date of this Consent Decree, which shall be the date on which this Consent Decree is entered by the District Court.

"Existing Facilities" means a subset of the Facilities with certain existing structural BMPs consisting of those Facilities located at 6875 Consolidated Way, San Diego, CA 92121 (aka "Miramar"), 104 N Johnson Ave., El Cajon, CA 92020 (aka "Eastern"), and 110 14th St., Ramona, CA 92065 (aka "Ramona").

"Existing Facilities' BMPs" means the existing structural BMPs located at the Existing Facilities which are designed to capture and treat stormwater from the Pole Area(s) of the Existing Facilities.

"Facilities" or "Facility" means the six (6) SDG&E Construction & Operation sites listed in Exhibit A to this Consent Decree.

"Facility-specific Pollutant Action Level" means the product of multiplying the Facility-specific Dilution Factor (as derived and defined in Paragraph 25 below) times a Pollutant Action Level. Where there is no applicable Facility-specific Dilution Factor, or where a dilution factor

has not yet been calculated by SDG&E for a Facility, then the Facility-specific Pollutant Action Level shall be equal to the Pollutant Action Level.

"Housekeeping BMPs" means the stormwater source control measures and best management practices identified in Paragraphs 6 to 15 of this Consent Decree.

"Infiltration BMP Pollutant Action Levels" means 1 ug/L for pentachlorophenol and 3 x $10^{-5}$ ug/L for the Dioxins TEQ.

"Interim Measures" means the placement of oil absorbent socks around the perimeter of the Pole Area(s), the placement of oil absorbent pads under the Pole Area(s), or the placement of drop inlet filtration in the storm drain inlet(s) that drain stormwater runoff from the Pole Area(s). Where Interim Measures are required under this Consent Decree, they shall only be required to be implemented during the Wet Season.

"Municipal Separate Storm Sewer System" ("MS4") means any publicly owned system for the collection, conveyance, and discharge of stormwater runoff.

"Pole Area" or "Pole Areas" means all locations at a Facility where pentachlorophenol-treated wood utility poles or other pentachlorophenol-treated wood materials, such as crossarms, are stored uncovered. For purposes of clarity, (i) the presence of pentachlorophenol-treated wood utility poles in service does not make any portion of a Facility a Pole Area that would not otherwise qualify as a Pole Area, and (ii) Treated Wood Waste (as defined in this Section I below) is not considered a pentachlorophenol-treated wood material.

"Pollutant" or "Pollutants" means pentachlorophenol and Dioxins.

"Pollutant Action Levels" mean 15 ug/L for pentachlorophenol and 2.8 x $10^{-8}$ ug/L for the Dioxins TEQ. "Pollutant Action Level" means either 15 ug/L for pentachlorophenol or 2.8 x $10^{-8}$ ug/L for the Dioxins TEQ.

"Sampling Best Efforts" means that following completion of two rounds of consecutive stormwater sampling during Business Hours as required for the Source Control BMP (as provided in Subparagraph 16(A)), the Existing Facilities' BMP (as provided in Paragraph 20), the Infiltration Treatment/Structural BMP (as provided in Subparagraph 21(A)(i), and the Filtration Treatment Treatment/Structural BMP (as provided in Subparagraph 21(E)(i)), in an effort to

collect a third round of samples during the same Wet Season as the second round sample was collected, SDG&E will seek to collect samples during weekdays from 6:00 AM to 3:00 PM, and on weekends from 8:00 AM to 5:00 PM (provided it is safe to proceed with sample collection). However, notwithstanding the forgoing, SDG&E will not be required to sample on Federal, State, or SDG&E company holidays, whether such holidays fall on a weekday or weekend. Should SDG&E be unable to collect a third round of consecutive samples during the same Wet Season as the second consecutive stormwater sampling event was completed, despite implementation of Sampling Best Efforts, Plaintiffs shall accept the two rounds of consecutive stormwater sampling for purposes of the Source Control BMP (as provided in Subparagraph 16(A)), the Existing Facilities' BMP (as provided in Paragraph 20), the Infiltration Treatment/Structural BMP (as provided in Subparagraph 21(A)(i)), and the Filtration Treatment Treatment/Structural BMP (as provided in Subparagraph 21(E)(i)).

"SDG&E Representative" means an employee, agent, consultant, or contractor of SDG&E or anyone authorized to act on SDG&E's behalf.

"Source Control BMP" means the elimination of existing Pole Area storage at any Facility, and the subsequent (i) sweeping, cleaning and power-washing (collectively, "Surface Cleaning"), (ii) resurfacing, or (iii) removal and replacement, of the surface of the eliminated Pole Area(s).

"Termination Date" means the date six (6) years after the Effective Date when this Consent Decree shall terminate in its entirety, or such earlier date if the conditions of Paragraph 42 are met.

"Treated Wood Waste" or "TWW" means any waste material that SDG&E intends to discard consisting of wood that has been treated with pentachlorophenol, including but not limited to utility poles, utility pole crossarms, portions of utility poles or utility pole crossarms, sawdust, wood chips, or similar debris generated when cutting or otherwise handling pentachlorophenol-treated utility poles or crossarms.

"Treatment/Structural BMPs" means the stormwater source control measures and best management practices identified in Paragraph 21 of this Consent Decree.

"Wet Season" means the seven-month period beginning October 1st of any given year and ending April 30th of the following year.

## II.     DISMISSAL AND JURISDICTION

2.     <u>Dismissal</u>. No later than ten (10) Days after the Effective Date, the Parties shall file with the District Court a Stipulation and Order that shall provide that the Complaint and all claims therein shall be dismissed with prejudice pursuant to Federal Rule of Civil Procedure 41(a)(2) concurrently with the District Court's retention of jurisdiction for the enforcement of this Consent Decree as provided herein.

3.     <u>Venue and Continuing Jurisdiction</u>. For purposes of this Consent Decree only, the Parties stipulate that venue is proper in the District Court and neither Party contests the exercise of jurisdiction by the District Court for purpose of overseeing implementation of the Consent Decree, any dispute resolution or enforcement pursuant to Section VIII, or in response to any motion filed pursuant to Federal Rule of Civil Procedure 60.

## III.     WORK TO BE PERFORMED

### Preparation of Stormwater Maps for Each Facility

4.     No later than ninety (90) Days after the Effective Date, SDG&E shall provide Plaintiffs with a "Facility Stormwater Map" for each Facility identifying all Pole Areas (or former Pole Area(s) eliminated as a result of the implementation of the Source Control BMP provided for in Paragraph 16) and any locations where stormwater runoff from the Pole Areas (or former Pole Area(s) eliminated as a result of the implementation of the Source Control BMP provided for in Paragraph 16) is collected and discharged. The maps shall include the following information, as applicable: (i) identification of any drop inlets, sumps, and/or catch basins receiving stormwater from Pole Areas, (ii) the corresponding stormwater discharge points for stormwater generated within each Pole Area (or former Pole Area eliminated as a result of the implementation of the Source Control BMP provided for in Paragraph 16), (iii) ground type(s) (pervious or impervious), (iv) the direction and pattern of surface stormwater flows at the Facilities from Pole Area(s) (or former Pole Area eliminated as a result of the implementation of the Source Control BMP provided for in Paragraph 16), (v) berms, dikes, walls, and all other structures controlling the flow

of surface water or any stormwater storage or treatment infrastructure (as well as the capacity of such infrastructure if capacity information is readily available); and (vi) where stormwater samples are collected. In addition, at a minimum, the maps for the Facilities shall also identify the Facilities' boundaries, the paved area(s) where TWW is generated or stored, each storm drain inlet that will be subject to inspection pursuant to Paragraph 9, driveways subject to inspection pursuant to Paragraphs 12, paved areas subject to subject to the requirements of Paragraph 13, and whether stormwater from a Facility discharges to an MS4. Within ninety (90) Days after SDG&E implements any additional Treatment/Structural BMP(s) at a Facility pursuant to this Consent Decree, SDG&E shall update the Facility Stormwater Map for the affected Facility to reflect the new Treatment/Structural BMP(s), and any resulting new or relocated discharge points for stormwater runoff from Pole Areas. SDG&E shall provide such updated maps with the next Annual Report as provided in Subparagraph 30(A).

**Housekeeping BMPs**

5.    Within ninety (90) Days after the Effective Date, and throughout the duration of this Consent Decree, unless and until a Facility is terminated in accordance with Paragraph 41, SDG&E shall implement Housekeeping BMPs at each Facility. The Housekeeping BMPs shall be designed and implemented at each Facility to reduce the potential for Pollutants to become entrained in stormwater flows or blow off the Facility, and to keep all paved areas of the Facility as clean as practicable to reduce the potential for TWW to be tracked off the Facility onto surface streets. The Housekeeping BMPs shall include the measures specified in Paragraphs 6 to 15 below.

6.    Site Sweeping and Cleaning of the Facilities. SDG&E shall implement the following site sweeping and cleaning measures at all uncovered portions of the Facility yards, as applicable:

A.    SDG&E shall sweep and clean all paved areas according to the following schedule: (a) once a month during the Wet Season, and (b) once in September of each year;

B.    On an annual basis before the start of the Wet Season, but after the annual sweeping in September mandated by Subparagraph 6(A), SDG&E shall conduct an inspection of

each Facility for the presence of TWW outside of TWW storage containers and/or Pollutant staining on the ground, and, to the extent warranted by the inspection, perform additional site cleaning as needed, including a power-wash of paved areas;

       C.      SDG&E shall not discharge any fluids or solids generated by sweeping or other site cleaning at the Facilities to storm drain inlets or waterways;

       D.      SDG&E shall collect and dispose of all wastes generated during cleaning and sweeping at the Facilities in a manner that complies with all local, state, and federal laws; and

       E.      SDG&E shall designate and provide appropriate training to the employees or contractors responsible for implementing site sweeping and cleaning to ensure compliance with these Consent Decree terms.

       7.      <u>TWW Collection & Management</u>. SDG&E will manage TWW as required by Article 11.2 of Chapter 6.5 of the California Health & Safety Code, or any subsequent amendments and/or implementing regulations.

       A.      SDG&E will do the following when generating TWW at its Facilities:

       (i)      Prior to cutting TWW in an outdoor location at the Facility, SDG&E will place visqueen underneath TWW to be cut, or use another equivalent method of capturing TWW sawdust and debris, to collect sawdust or debris generated from such cutting operations. After cutting, SDG&E will sweep, vacuum, or otherwise clean the visqueen, or other method of capturing TWW sawdust and debris, to remove any TWW sawdust or debris and place the sawdust or debris in a TWW storage bin for offsite disposal;

       (ii)      When TWW sawdust or debris is generated at a Facility, SDG&E will also promptly sweep, vacuum, or otherwise clean any area at the Facility where TWW sawdust or debris have fallen to remove TWW sawdust or debris and place it within a TWW storage bin for offsite disposal; and

       (iii)      Operations generating TWW shall be confined to designated paved areas at each Facility, as reflected on the maps prepared pursuant to Paragraph 4.

       8.      <u>Storm Drain Covers</u>. During the Dry Season, on each stormwater drop inlet that receives stormwater runoff from Pole Areas, SDG&E shall install a solid material cover to

prevent dust and solids from collecting in the inlet. These covers may be removed prior to the start of any forecasted precipitation with a likelihood of occurrence of 50% or greater as determined by the applicable National Oceanic and Atmospheric Administration forecast. Covers shall not be required during the Wet Season.

9.      Storm Drain Inlet Inspection and Cleaning. Annually, prior to the beginning of the Wet Season, SDG&E shall inspect the storm drain inlets, if any, at each Facility. To the extent warranted by this inspection, SDG&E shall clean each drain inlet as needed using a vacuum or other effective cleaning device/method in order to remove dust and solids that have entered the storm drain inlets. As necessary, SDG&E shall clean out the drain inlet at the Facilities following significant storm events and shall properly dispose of any solids removed from storm drain inlets. SDG&E shall inspect the drain inlets at each Facility during the Wet Season at least monthly and, as needed, properly remove and dispose of any solids identified in the storm drain that could materially affect its functioning.

10.      Wet Weather Visual Observations During Stormwater Sampling. At each stormwater sampling event required by this Consent Decree at a Facility occurring during Business Hours, SDG&E shall observe the potential discharge location(s), including the perimeter of the Facility, to determine if and where discharge of stormwater from Pole Areas is occurring. During such wet weather visual observations, appropriately trained SDG&E Representatives shall monitor for the presence of visually observable oil sheens in any stormwater discharges and/or discolored or turbid stormwater discharges and, consider any such observations as it implements the Treatment/Structural BMP(s) identified in Paragraph 21 or makes any modifications to an Existing Facility BMP as provided for in Subparagraph 20(A).

11.      Visual Inspections. Appropriately trained SDG&E Representatives shall conduct visual inspections at each Facility at least monthly during the Wet Season and at least once during the Dry Season. Such visual inspections shall include (i) Pole Areas and areas where TWW may be generated or stored, and driveways where vehicles exit from the Facility, (ii) all designated stormwater discharge points for accumulation of debris, sediment, sand, grit, oily substances, oily sheens upon any standing water, and other materials that may affect stormwater quality

discharging from the Facility, and (iii) observations of any Existing Facilities' BMP identified in Paragraph 20 or Treatment/Structural BMP identified in Paragraph 21 and any Alternative BMP Proposal (as defined below) approved in accordance with Paragraph 23 that is implemented at the Facility to ensure that it is in good condition and working order, and shall verify that Housekeeping BMPs are being implemented to the extent practicable.

12.    _Inspection for Offsite Tracking_. SDG&E shall inspect the driveways where vehicles exit from Facility and immediately adjacent areas of adjoining streets at each Facility once per month during the Wet Season and at least once during the Dry Season to determine whether solids are being tracked offsite from the Facilities onto adjoining streets by vehicle traffic. If SDG&E observes offsite tracking of solids from the Facilities, SDG&E will, to the extent practicable, sweep areas where tracking has been observed.

13.    _Inspection of Paved Areas_. SDG&E shall inspect the paved portions of the Pole Areas and areas where TWW is generated or stored at each Facility on an annual basis and implement spot repairs on an as-needed basis to eliminate material cracks that could trap Pollutants and/or to maintain stormwater drainage from the Facilities within designed or designated flow paths.

14.    _Training_. At least annually, and prior to the Wet Season following the hiring of new SDG&E employees directly involved in stormwater management, inspection or grounds cleaning at the Facilities, SDG&E shall conduct training to explain the requirements of the Consent Decree to the extent applicable to such employee. Training shall focus on the employee's role in implementing various Consent Decree measures including, for example, implementation of Housekeeping BMPs at the Facilities. If necessary, this training shall be conducted bilingually (i.e., Spanish/English or other pertinent language) to the extent that an employee is not reasonably able to comprehend training in English. For non-employee SDG&E Representatives involved in stormwater management, inspection or grounds cleaning governed by the terms in this Consent Decree, SDG&E shall ensure the SDG&E Representative is familiar with and complies with the applicable provisions of this Consent Decree.

15.     Housekeeping Logs. SDG&E shall develop and use standardized log forms to track the dates on which site sweeping, cleaning, inspections and visual observations are performed in accordance with Paragraphs 6, 9, 10, 11, 12 and 13, and note any identified concerns and responsive actions taken by SDG&E.

**Source Control BMP**

16.     SDG&E, in its sole discretion, shall have the option to implement the Source Control BMP in lieu of any Existing Facilities' BMP as provided for in Paragraphs 17-20, Treatment/Structural BMP as provided for in Paragraph 21, or approved Alternative BMP as provided for in Paragraph 23.

A.     If SDG&E elects to perform Surface Cleaning in implementing the Source Control BMP at any Facility, the Surface Cleaning will be considered successful if laboratory results from two (2) consecutive rounds of stormwater samples collected during Business Hours and implementation of Sampling Best Efforts reflect attainment of Facility-specific Pollutant Action Levels. Stormwater samples shall be collected from sheet flow runoff that drains the eliminated Pole Area(s). If the laboratory results reflect attainment of Facility-specific Pollutant Action Levels, no further work shall be required to implement the Source Control BMP. If the laboratory results do not reflect attainment of Facility-specific Pollutant Action Levels, SDG&E, in its sole discretion, shall have the option to implement further Surface Cleaning prior to the next Wet Season, or commence the work to resurface or remove and replace the surface of the Pole Area(s) prior to the next Wet Season. If SDG&E elects to implement further Surface Cleaning, it shall collect stormwater samples in accordance with this Subparagraph 16(A) commencing the next Wet Season.  If after the second round of Surface Cleaning, the laboratory results do not reflect attainment of Facility-specific Pollutant Action Levels, SDG&E shall either resurface or remove and replace the surface of the Pole Area(s).

B.     If SDG&E elects to implement resurfacing or removal and replacement of the surface of the Pole Area(s) at any Facility, or SDG&E implements resurfacing or removal and replacement of the surface of the Pole Area(s) in accordance with Subparagraph 16(A), no sampling shall be required, and the Source Control BMP shall be considered fully implemented

upon completion of the resurfacing or removal and replacement of the surface of the Pole Area(s) and no further work to implement the Source Control BMP will be required.

C.      Within 30 Days of the Effective Date of the Consent Decree, SDG&E shall notify Plaintiffs of any Facilities where it initially intends to implement the Source Control BMP and shall include in such notice whether it elects to implement Surface Cleaning, resurfacing, or removal and replacement of the surface of the Pole Area(s).

D.      Provided the Effective Date of the Consent Decree is no later than August 1, 2024, SDG&E shall cease Pole Area storage at the Facilities for which it provided notice in accordance with Subparagraph 16(C) prior to the start of the 2024-2025 Wet Season.  If the Effective Date of the Consent Decree is after August 1, 2024, and SDG&E is unable to implement the work necessary to cease Pole Area storage at the Facilities for which it provided notice in accordance with Subparagraph 16(C) prior to the start of the 2024-2025 Wet Season, it shall implement Interim Measures during the 2024-2025 Wet Season, and implement the work necessary to cease Pole Area storage at the Facilities for which it provided notice in accordance with Subparagraph 16(C) prior to the start of the 2025-2026 Wet Season.

E.      If SDG&E elects to perform Surface Cleaning at the Pole Area(s) at the Facilities where notice was provided in accordance with Subparagraph 16(C), and the Effective Date of the Consent Decree is on or before August 1, 2024, SDG&E shall complete the Surface Cleaning prior to the start of the 2024-2025 Wet Season and proceed with stormwater sampling in accordance with Subparagraph 16(A) during the 2024-2025 Wet Season.  If the Effective Date of the Consent Decree is after August 1, 2024, and SDG&E cannot complete the Surface Cleaning prior to the start of the 2024-2025 Wet Season, it shall implement Interim Measures during the 2024-2025 Wet Season, and perform the Surface Cleaning prior to the start of the 2025-2026 Wet Season.

F.      Should SDG&E elect to perform Surface Cleaning and sampling in accordance with Subparagraph 16(A), and the laboratory results do not reflect attainment of Facility-specific Pollutant Action Levels, and provided SDG&E elects to implement a further round of Pole Area Surface Cleaning, such further Surface Cleaning shall be completed prior to

the next Wet Season.  If after two-rounds of Surface Cleaning, laboratory results do not reflect attainment of Facility-specific Pollutant Action Levels, SDG&E shall commence work to implement resurfacing or removal and replacement of the surface of the Pole Area(s) prior to the next Wet Season and use best efforts to implement the resurfacing or removal and replacement of the surface of the Pole Area(s) prior to the next Wet Season.  If the resurfacing or removal and replacement of the surface of the Pole Area(s) cannot be completed prior to the next Wet Season, SDG&E shall complete it prior to the next following Wet Season.  Within 14 Days of receiving laboratory results that do not reflect attainment of Facility-specific Pollutant Action Levels, SDG&E shall implement Interim Measures for the remainder of the Wet Season, and any further Wet Season(s) until laboratory results reflect attainment of Facility-specific Pollutant Action Levels or the resurfacing or removal and replacement of the surface of the Pole Area(s) is complete.

G.      If SDG&E elects to resurface or remove and replace the surface of the Pole Area(s) where notice was provided in accordance with Subparagraph 16(C), as needed, SDG&E shall submit the information necessary to obtain permits or authorizations to proceed with the resurfacing or removal and replacement of the surface of the Pole Area(s) within 120 Days of the Effective Date of the Consent Decree, and shall implement the resurfacing or removal and replacement of the surface of the Pole Area(s) by no later than the start of the 2025-2026 Wet Season (provided it can timely obtain any required permits or authorizations).  Should the resurfacing or removal and replacement of the surface of the Pole Area(s) not occur prior to the 2024-2025 Wet Season, SDG&E shall implement Interim Measures during the 2024-2025 Wet Season and any further Wet Season until the resurfacing or removal and replacement of the Pole Area(s) is complete.

H.      When implementing the Source Control BMP, SDG&E shall comply with all applicable laws and regulations and shall obtain any required permits or approvals from appropriate regulatory agencies.

I.      SDG&E shall notify Plaintiffs of the status of the implementation of the Source Control BMP as part of the Annual Reports required by Section V (REPORTING).

J.      Notwithstanding anything set forth above, after the 2024-2025 Wet Season, SDG&E shall have the option to implement the Source Control BMP at any other Facility (including at the Existing Facilities) in lieu of any Existing Facilities' BMP work or Treatment/Structural BMP work as provided for in this Consent Decree, and shall notify Plaintiffs of its decision to implement the Source Control BMP at a Facility within 10 Days of SDG&E electing to implement the Source Control BMP. Should SDG&E elect to implement the Source Control BMP at any Facility after the 2024-2025 Wet Season, it shall implement the Source Control BMP in accordance with the schedule and approach outlined in this Paragraph 16, taking into account that the schedule shall be modified to account for the appropriate Wet Season(s). Until such time as the Source Control BMP is fully implemented, SDG&E shall implement Interim Measures or, as relevant, maintain the Existing Facilities' BMPs. SDG&E shall notify Plaintiffs of the status of the implementation of the Source Control BMP as part of the Annual Reports required by Section V (REPORTING).

**Existing Facilities' BMP**

17.      Unless SDG&E elects to notify Plaintiffs that it shall implement the Source Control BMP in accordance with Subparagraph 16(C), within 45 Days of the Effective Date of the Consent Decree, SDG&E shall, at its sole discretion, have the opportunity to demonstrate that existing structural BMPs at the Existing Facilities are sized to handle stormwater runoff up to the Design Storm from the Poles Area(s).

18.      Provided (i) the existing structural BMPs at the Existing Facilities are sized in compliance with Paragraph 17, (ii) neither relocation of the Pole Area(s) nor re-routing of the stormwater collection/conveyance is necessary, and (iii) the Effective Date of this Consent Decree is no later than October 1, 2024, at its sole discretion, SDG&E shall demonstrate (as set forth in Paragraph 20 below), commencing in the 2024-2025 Wet Season, that stormwater runoff from up to the Design Storm meets the Infiltration BMP Pollutant Action Levels or the Facility-specific Pollutant Action Levels, as appropriate for the existing structural BMP(s), at the Pole Area(s).  If the Effective Date is after October 1, 2024, SDG&E shall use its best efforts to collect the required demonstration samples during the 2024-2025 Wet Season.

14

19.     If the existing structural BMPs at the Existing Facilities are sized in compliance with Paragraph 17 but work is required to relocate the Pole Area(s) or re-route the stormwater collection/conveyance to within the drainage area of the existing structural BMP(s) at the Existing Facilities, SDG&E shall, in its sole discretion, have one-year from the Effective Date of this Consent Decree, to re-locate the Pole Area(s) or re-route the stormwater collection/conveyance (provided it can timely obtain any required permits or authorizations). For purposes of this Paragraph 19, SDG&E shall demonstrate (as set forth in Paragraph 20 below), that stormwater runoff from up to the Design Storm meets the Infiltration BMP Pollutant Action Levels or the Facility-specific Pollutant Action Levels, as appropriate for the existing structural BMP(s), at the Pole Area(s). During the period between the Effective Date and the commencement of the demonstration (as set forth in Paragraph 20 below), SDG&E shall implement Interim Measures during any Wet Season.

20.     The demonstration for the Existing Facilities' BMP(s) shall be considered successful after laboratory results of samples of stormwater runoff from the Pole Area(s), collected from two (2) consecutive stormwater sampling events, during two (2) distinct storm events (i.e., proceeded by 48 hours of no more than 0.1 inch of precipitation at the relevant facility), occurring during the Business Hours, and implementation of Sampling Best Efforts demonstrate that stormwater runoff from up to the Design Storm reflect attainment of the Infiltration BMP Pollutant Action Levels or the Facility-specific Pollutant Action Levels at the Pole Area(s), as appropriate for the existing structural BMP(s).

      A.     If at any time during the demonstration, sampling results indicate that the existing structural BMPs at the Existing Facilities do not meet the appropriate Infiltration BMP Pollutant Action Levels or the Facility-specific Pollutant Action Levels at the Pole Area(s), SDG&E shall implement Interim Measures for the remainder of the Wet Season and any following Wet Season(s) until either SDG&E elects to implement the Source Control BMP or modify or adjust the treatment of stormwater prior to discharge to the existing structural BMP to meet the appropriate Infiltration BMP Pollutant Action Levels or the Facility-specific Pollutant Action Levels at the Pole Area(s). SDG&E shall continue implementing Interim Measures until

such changes are completed.

        B.      When implementing any modification or adjustment to an Existing Facility BMP, SDG&E shall comply with all applicable laws and regulations and shall obtain any required permits or approvals from appropriate regulatory agencies.

        C.      SDG&E shall notify Plaintiffs of the status of the Existing Facilities' BMP efforts as part of the Annual Reports required by Section V (REPORTING). SDG&E shall apprise Plaintiffs of the anticipated timing of addressing issues encountered in Subparagraph 20(A) prior to the Termination Date and will prioritize work based on sampling results.

**Treatment/Structural BMP Program**

    21.    Treatment/Structural BMP Obligation. At each Pole Area at a Facility where SDGE does not elect to implement the Source Control BMP or demonstrate that the structural BMPs at the Existing Facilities meet the appropriate Infiltration BMP Pollutant Action Levels or the Facility-specific Pollutant Action Levels at the Pole Area(s) as provided by Paragraph 20, SDG&E shall implement one or more of the Treatment/Structural BMPs described in the following Subparagraphs 21(A)-(E), which shall be designed and reasonably expected to treat Pollutants to applicable treatment standards at the Pole Area(s) or otherwise avoid or minimize discharge of Pollutants in any stormwater runoff from Pole Areas. At each Pole Area, SDG&E shall have sole discretion to choose which of the following Treatment/Structural BMP(s) to implement.

        A.      Infiltration: Implement structural improvements (e.g., infiltration basins, bioswales, dry wells, ditches, trenches or functionally equivalent infrastructure) in accordance with applicable regulatory requirements and sized, at a minimum, to infiltrate stormwater runoff from a Facility's Pole Area(s) up to the Design Storm ("Infiltration BMP"). SDG&E shall install pre-treatment infrastructure as necessary to treat runoff from the Pole Area(s) generated from, at a minimum, the Design Storm to (i) to remove oil as necessary to ensure the effectiveness of the treatment prior to discharge to the Infiltration BMP, and (ii) meet the Infiltration BMP Pollutant Action Levels. SDG&E shall only install an Infiltration BMP under the following conditions: (a) the area being treated by the Infiltration BMP has a slope less than 15%; (b) there is no local,

state or federally directed cleanup of groundwater contamination within 100 feet of the Infiltration BMP site; (c) the Infiltration BMP site has a hydrologic soil group type of A, B, or C as defined by the United States Department of Agriculture Natural Resources Conservation Services or site-specific percolation test results showing equivalent infiltration; and (d) the depth to groundwater at the Infiltration BMP site is greater than 10 feet.

(i)      Infiltration BMP Demonstration. At each Facility where SDG&E elects to install an Infiltration BMP, SDG&E shall demonstrate that the pre-treatment prior to the Infiltration BMP is successful.  A demonstration will be considered successful after laboratory results of samples of stormwater into the Infiltration BMP (or alternatively, in lysimeter samples collected from the vadose zone beneath the Infiltration BMP), taken during two consecutive stormwater sampling events occurring during Business Hours and implementation of Sampling Best Efforts, reflect attainment of the Infiltration BMP Pollutant Action Levels. To the extent the demonstration sampling indicates a need to modify or adjust the pretreatment of stormwater prior to discharge to the Infiltration BMP, SDG&E will make such adjustment(s) no later than the start of the next Wet Season following the sampling that indicated the need for the adjustment (provided it can timely obtain any required permits or authorizations).  Sampling post-adjustment to demonstrate compliance shall proceed as outlined in this Subparagraph 21(A)(i).  Once the Infiltration BMP demonstration is determined to be successful, no further sampling of that Infiltration BMP installation will be necessary at the Facility where that BMP has been installed.

B.      Covered Storage: Implement structural improvements that are designed to shield pentachlorophenol-treated wood materials stored at a Facility's Pole Area(s) from contact with stormwater, such as with a roof, with fixed and/or moveable sides on a paved surface with berms. SDG&E shall provide Plaintiffs copies of the design plans for each Facility where the Covered Storage Treatment/Structural BMP will be implemented no later than (5) Days before implementation.

C.      Sanitary Sewer:  In accordance with a publicly owned treatment works' ("POTW") requirements, capture and divert stormwater, at a sizing adequate to capture stormwater up to the Design Storm, from a Facility's Pole Area(s) into a POTW's sewer system.

Upon SDG&E's notification that an agency deemed the application for a discharge pursuant to this Subparagraph 21(C) complete, SDG&E shall provide Plaintiffs with a copy of such complete application within ten (10) Days.

        D.     <u>Permit or Order</u>: Discharge stormwater from a Facility's Pole Area(s) as required or authorized by a regulatory agency permit, order, decree or equivalent requirement (e.g., Waste Discharge Requirements), provided that compliance with the relevant requirements precludes an offsite imminent and substantial endangerment from any release of stormwater. Upon SDG&E's notification that an agency deemed the application for a discharge pursuant to this Subparagraph 21(D) complete, SDG&E shall provide Plaintiffs with a copy of such complete application within ten (10) Days.

        (i)     A permit issued by the United States Environmental Protection Agency for a Class V underground injection control well shall not qualify as a Permit or Order Treatment/Structural BMP.

        (ii)     Should SDG&E obtain coverage under (1) the Industrial General Storm Water Permit, (2) a Facility-specific NPDES permit that addresses stormwater discharges from the Facility, or (3) a company-specific or industry-specific NPDES permit that covers stormwater discharges from the Facilities, such NPDES permit shall qualify as a Permit or Order Treatment/Structural BMP. In the event such NPDES permit coverage is obtained, unless there is a direct conflict between the NPDES permit terms and the Housekeeping BMPs, SDG&E shall continue to comply with the Housekeeping BMPs in accordance with the terms of this Consent Decree. Should SDG&E seek to obtain a facility-specific, company-specific or industry-specific NPDES permit coverage as provided in (D)(ii)(2) or (3) above, SDG&E shall ensure that Plaintiffs are included among the people to receive public notice in accordance with the regulating agency's NPDES permitting procedure.

        (iii)     Should SDG&E obtain a permit, order, decree or equivalent requirements other than those provided for in Subparagraph 21(D)(ii) regulating the discharge of stormwater from a Facility's Pole Area(s), SDG&E shall meet and confer with Plaintiffs as to whether SDG&E's discharge of stormwater from a Facility, in compliance with such permit,

order, decree or equivalent requirement, adequately precludes any offsite imminent and

substantial endangerment from the discharge of stormwater from that Facility's Pole Area(s). Any

dispute between the Parties as to whether such permit, order, decree or equivalent requirement

qualifies for purposes of the Permit or Order Treatment/Structural BMP shall be resolved

pursuant to the process set forth in Section VII (TECHNICAL DISPUTE RESOLUTION).

E.      Filtration Treatment: Prior to discharge, route all stormwater from a

Facility's Pole Area(s) through a stormwater filtration treatment BMP sized to capture and treat,

at a minimum, runoff from up to the Design Storm through a series of filters, before discharge

off-site, that consist of mixed media filters, bag filters, and/or activated carbon polishing (together

with on-site storage necessary to support flow equalization and treatment unit function)

("Filtration Treatment BMP"). The Filtration Treatment BMP shall be designed to reduce

Pollutants in stormwater runoff up to the Design Storm from the Pole Area(s) to, or below,

Facility-specific Pollutant Action Levels.

(i)      Filtration Treatment BMP Demonstration. At each Facility where

SDG&E elects to install a Filtration Treatment BMP, SDG&E shall demonstrate that the

Filtration Treatment BMP is successful.  A demonstration will be considered successful after

laboratory results of samples of stormwater from the Pole Area(s) discharged from the Filtration

Treatment BMP, taken during two consecutive stormwater sampling events occurring during

Business Hours and implementation of Sampling Best Efforts, reflect attainment of the Facility-

specific Pollutant Action Levels. To the extent the demonstration sampling indicates a need to

modify or adjust the Filtration Treatment BMP, SDG&E will make such adjustment(s) no later

than the start of the next Wet Season following the sampling that indicated the need for the

adjustment (provided it can timely obtain any required permits or authorizations). Sampling post-

adjustment(s) to demonstrate compliance shall proceed as outlined in this Subparagraph 21(E)(i).

Once the Filtration Treatment BMP demonstration is determined to be successful, no further

sampling of that Filtration Treatment BMP installation will be necessary.

22.      Treatment/Structural BMPs Implementation Timeframe.

A.      SDG&E shall have sole discretion to choose the Facilities where

Treatment/Structural BMPs will commence implementation in each year, except that SDG&E

agrees to commence implementation of its preferred Treatment/Structural BMP(s) at the Metro

Facility within one year after the Effective Date and the North Coast Facility within two years

after the Effective Date. Commencement of implementation shall, at a minimum, require the

development of design specifications and the submittal of necessary permit applications. Prior to

completion of implementation of the Treatment/Structural BMPs at the Metro and North Coast

Facilities, SDG&E shall implement Interim Measures.

            B.      SDG&E shall notify Plaintiffs which Facilities it will commence

implementation at, the selected Structural/Treatment BMP, and status of the implementation as

part of the Annual Reports required by Section V (REPORTING).

          23.      <u>Alternative BMPs</u>. SDG&E may develop and employ alternative BMPs for Pole

Area(s) and gather stormwater runoff Pollutant level data concerning their effectiveness. If the

data gathered by SDG&E shows that alternative BMPs are effective to meet Facility-specific

Pollutant Action Levels in stormwater runoff up to the Design Storm from the Pole Area(s) that is

discharged off-site or, the Infiltration BMP Pollutant Action Levels, in stormwater runoff up to

the Design Storm from the Pole Area(s) that is infiltrated onsite, and SDG&E decides to

implement those alternative BMPs to meet the requirements of this Consent Decree, SDG&E

shall prepare and present a report to Plaintiffs proposing to add alternative BMPs for purposes of

compliance with this Paragraph 23 ("Alternative BMP Proposal"). Plaintiffs shall have forty-five

(45) days after receipt of an Alternative BMP Proposal to review and provide written comment to

SDG&E. If Plaintiffs do not oppose SDG&E's Alternative BMP Proposal in writing within the

45-day review period, SDG&E may implement the Alternative BMP Proposal in lieu of one or

more of the Treatment/Structural BMPs specified in Paragraph 21 for the Pole Area(s) identified

in the Alternative BMP Proposal. Notwithstanding the foregoing, Plaintiffs shall not

unreasonably oppose an Alternative BMP Proposal if it complies with applicable legal

requirements and it is demonstrated that the Alternative BMP Proposal is equivalent in

effectiveness to the Treatment/Structural BMPs listed in Paragraph 21. If the Parties are unable to

agree on SDG&E's Alternative BMP Proposal, then their dispute shall be resolved pursuant to the technical dispute resolution provisions of Section VII (TECHNICAL DISPUTE RESOLUTION).

24.     When implementing the Treatment/Structural BMPs and any approved Alternative BMP Proposal as described in Paragraphs 21 and 23, SDG&E shall comply with all applicable laws and regulations and shall obtain any required permits or approvals from appropriate regulatory agencies.

### Facility-specific Pollutant Action Levels

25.     Calculation and Application of Facility-Specific Pollutant Action Levels. As appropriate, Facility-specific Pollutant Action Levels shall apply to the levels of Pollutants detected in stormwater discharges from the Source Control BMP as set forth in Paragraph 16A, Existing Facilities BMP as set forth in Paragraph 20, Filtration Treatment BMP as set forth in Subparagraph 21(E)(i) or, an Alternative BMP Proposal approved pursuant to Paragraph 23. Facility-specific Pollutant Action Levels shall be derived by multiplying the Pollutant Action Levels by Facility-specific Dilution Factors calculated in accordance with Subparagraph 25(B).

A.     SDG&E calculated dilution factors pursuant to Subparagraph 25(B) to apply to the levels of Pollutants detected in stormwater runoff from Pole Area(s) that is discharged to an MS4 or receives off-site run-on ("Facility-specific Dilution Factors"). Facility-specific Dilution Factors are attached hereto as Exhibit B. The Facility-specific Dilution Factors attached as Exhibit B shall apply for purposes of this Consent Order except as provided in Subparagraph 30(C).

B.     SDG&E calculated Facility-specific Dilution Factors consistent with industry standard and practice and that incorporated the following steps: (i) estimated runoff volume from the Pole Area(s) of a specific Facility; (ii) estimated runoff volume for the stormwater drainage basin that receives stormwater runoff from the Facility; and (iii) calculated the ratio of total runoff volume for the surrounding stormwater drainage basin relative to the total runoff volume from the Pole Area(s) at the specific Facility. Stated via equation, dilution factors were calculated as follows:

Dilution factor = surrounding drainage basin area runoff volume/Pole Area runoff volume

Calculation of the runoff volumes, used in determining a dilution factor, accounted for the imperviousness and soil infiltration characteristics of the relevant Pole Area(s) and the associated stormwater drainage basin surrounding the relevant Facility. The size of the stormwater drainage basin surrounding the Facility was estimated via the use of publicly available information, including maps, topography, and visual information.

26.    Optional Report(s) Regarding Background Concentrations of Dioxins.  If Dioxin concentrations in stormwater runoff from a Pole Area that is discharged off-site exceeds a Facility-specific Pollutant Action Level for Dioxin for a Source Control BMP pursuant to Subparagraph 16(A), an Existing Facility BMP pursuant to Paragraph 20, or after implementation of the Filtration Treatment BMP pursuant to Subparagraph 21(E)(i), or the Alternative BMP Proposal approved pursuant to Paragraph 23, SDG&E, at its sole discretion, may direct a third-party consultant to provide a technical report evaluating whether and to what extent off-site background Dioxin concentrations may be affecting the Dioxin concentrations detected in stormwater samples taken at a Facility ("Background Concentration Report"). Based on the data analysis in the Background Concentration Report, SDG&E may propose an adjusted Facility-specific Pollutant Action Level for Dioxin for the affected Facility that takes into account the Dioxin loading from offsite sources. Upon receipt of SDG&E's proposal for an adjusted Facility-specific Pollutant Action Level for Dioxin in accordance with this Paragraph 26, and the supporting Background Concentration Report, Plaintiffs shall have thirty (30) days to review and provide written comment to SDG&E. If Plaintiffs do not oppose SDG&E's proposal for an adjusted Facility-specific Pollutant Action Level for Dioxin in writing within the 30-day review period, SDG&E may use the adjusted Facility-specific Pollutant Action Level for Dioxin specified in the proposal to evaluate compliance with this Consent Decree at the affected Facility. If Plaintiffs object to the adjusted Facility-specific Pollutant Action Level for Dioxin, the Parties shall resolve their differences pursuant to the technical dispute resolution provisions of Section VII (TECHNICAL DISPUTE RESOLUTION).

## IV.    SAMPLING AND INSPECTIONS

27.    <u>Sampling Parameters</u>. All samples shall be analyzed for pentachlorophenol utilizing EPA Method 8270C and for Dioxins utilizing EPA Method HRGC/HRMS 8290 for tetra through octa chlorinated dibenzo dioxins and furans. Sample analysis must be performed on unfiltered samples by a laboratory accredited by the State of California. SDG&E shall request the laboratory to achieve the lowest method detection level and lowest minimum level or reporting level that can be accomplished with the relevant method and sample matrix. For purposes of comparison to the Pollutant Action Level or Facility-specific Pollutant Action Level, SDG&E shall calculate the Dioxins TEQ using the equation and the Toxicity Equivalency Factors and Bioaccumulation Equivalency Factors provided in Exhibit C to this Consent Decree. For purposes of comparison to the Infiltration BMP Pollutant Action Level, SDG&E shall calculate the Dioxins TEQ using the equation for the Toxicity Equivalency Factors provided in Exhibit C to this Consent Decree. In calculating the Dioxins TEQ, constituents reported as ND (not detected) or DNQ (detected, not quantifiable) by the laboratory will be treated as equivalent to zero. The calculated Dioxins TEQ shall be used for comparisons to the Dioxins Infiltration BMP Pollutant Action Level, Pollutant Action Level or Facility-specific Pollutant Action Level.

28.    <u>Inspections During the Term of this Consent Decree</u>. SDG&E shall permit representatives of Plaintiffs to perform inspections of any of the Facilities that remain subject to the Consent Decree at a rate of no more than once every other calendar year, and no more than three (3) Facility inspections shall be performed in any one calendar year. Each inspection shall be performed during Business Hours. Each inspection shall be performed by no more than three (3) representatives of Plaintiffs and may include photographing and/or videotaping of inspected areas without capturing sound and avoiding images of SDG&E Representatives. Plaintiffs shall provide SDG&E with a copy of all photographs and video no later than five (5) Days after the inspection. The duration of Plaintiffs' inspection shall not exceed two (2) hours and shall be limited to the outdoor areas of the Facility yard where TWW storage bins, Existing Facilities' BMPs, Treatment/Structural BMPs, Pole Areas, and storm drain inlets are located, and where stormwater runoff from such areas flows. Plaintiffs' representatives must remain with SDG&E's

Representative at all times during the inspection and comply with all Facility rules and requirements. Plaintiffs shall provide at least two (2) full business days advance written notice of an inspection conducted pursuant to this Paragraph 28 identifying the inspection date and start time and name of the Plaintiffs representatives who will attend the inspection, and providing contact information for such individuals. Such notice shall be provided to the attention of David Speaker at dspeaker@sdge.com, unless and until new contact information is provided by SDG&E. Once Plaintiffs provides notice of a Facility inspection, it will count as one of the three inspections for the year, regardless of whether the inspection occurs.  Notwithstanding the foregoing, Plaintiffs shall have the right to cancel and reschedule one inspection per calendar year due to a change in weather forecast.  In the event of a pandemic or other similar type situation, the Parties agree to work together to ensure health and safety parameters are implemented during any inspection that are consistent with SDG&E policies and protocols. Any dispute with respect to such policies or protocols shall be resolved pursuant to the process set forth in Section VIII (DISPUTE RESOLUTION AND ENFORCEMENT OF CONSENT DECREE). Nothing herein shall be construed to prevent SDG&E from continuing to implement Facility and regulatory rules and requirements, or any Housekeeping BMPs, Interim Measures, Existing Facilities' BMPs, or Treatment/Structural BMPs consistent with the terms of this Consent Decree during the period prior to an inspection by Plaintiffs or at any other time.

29.     No Party shall withhold from any other Party any data incorporated into any required report or proposal presented or response to such report or proposal exchanged by the Parties in accordance with this Consent Decree. This Paragraph 29, however, in no way waives the attorney-client privilege or the attorney work product doctrine as to advice and communication about such information developed by or provided to any Party or as may otherwise be applicable.

V.     **REPORTING**

30.     Contents and Schedule for Submission of Annual Reports. SDG&E shall prepare and provide to Plaintiffs a report documenting SDG&E's actions to comply with this Consent

Decree during the prior reporting year (January 1 to December 31) by July 15 of each year that this Consent Decree is in effect ("Annual Report"), as follows:

A.    <u>BMPs</u>. The Annual Report will summarize the Housekeeping BMPs, Existing Facility BMPs, Source Control BMP, Treatment/Structural BMPs, any actions taken to address any reported exceedance(s) during the prior reporting year of either a Facility-specific Pollutant Action Level or Infiltration BMP Pollutant Action Level, and SDG&E's assessment of the efficacy of these actions, and the Source Control BMP, modifications to the Existing Facilities' BMPs, and/or Treatment/Structural BMPs SDG&E plans to implement or commence to implement in the next reporting year, including identification of the Facilities where SDG&E intends to implement or commence work to implement the Source Control and Treatment/Structural BMPs or modify the Existing Facilities BMPs. The Annual Report shall also include copies of any Facility Stormwater Map updated during the prior reporting year in accordance with Paragraph 4.

B.    <u>Analysis of Sampling Data and Laboratory Reports</u>. The Annual Report shall include summary table(s) of laboratory analytical results for any stormwater samples collected pursuant to the requirements of this Consent Decree during the prior reporting year, together with comparison of the laboratory analytical results to the applicable Facility-specific Pollutant Action Levels or Infiltration BMP Pollutant Action Levels. The Annual Report will also include copies of the final laboratory reports for any stormwater samples collected pursuant to the requirements of this Consent Decree during the prior reporting year. If for any reason SDG&E does not collect stormwater samples as required by this Consent Decree, the Annual Report shall describe the reason(s) the sampling did not occur as required, and, as appropriate, the remedial action(s) SDG&E will take to prevent recurrence.

C.    <u>Dilution Factors</u>. In the event of a revision to any Facility-Specific Dilution Factors as set forth in Exhibit B, due to changed circumstances, SDG&E shall report the updated Facility-specific Dilution Factors that it applies to data included in the Annual Report and provide the calculations performed to arrive at those Facility-specific Dilution Factors. Any dispute between the Parties as to the updated Facility-specific Dilution Factors shall be resolved pursuant

to the process set forth in Section VII (TECHNICAL DISPUTE RESOLUTION).

D.  Regulatory Agency Documents. During the term of this Consent Decree, SDG&E shall provide Plaintiffs, in its Annual Report, with copies of all permit applications required for implementation of this Consent Decree except for those applications previously provided in accordance with Subparagraphs 21(C) and (D), substantively material agency correspondence related to permit conditions, and issued regulatory agency permits and authorizations associated with the implementation of the Source Control BMP described in Subparagraphs 16(F), (G) or (J), the Existing Facilities' BMPs described in Paragraphs 19 or 20, the Treatment/Structural BMPs described in Paragraph 21, or an Alternative BMP Proposal approved pursuant to Paragraph 23, sent or received by SDG&E during the prior reporting year.

E.  Non-confidential Summary. Each Annual Report shall contain a non-confidential portion summarizing SDG&E actions taken in the prior year, the status of Consent Decree implementation, and plans for the following year.

F.  Preservation. From six years from the Effective Date,  SDG&E shall preserve all final data and documents required to be generated under this Consent Decree.

G.  Certification. Annual reports submitted by SDG&E pursuant to this Consent Decree shall be certified substantially as follows:

> I certify under penalty of law that this document and all attachments were prepared under my direction or supervision in accordance with a system designed to assure that qualified personnel properly gather and evaluate the information submitted. Based on my inquiry of the person or persons who manage the system, or those persons directly responsible for gathering the information, the information submitted is, to be the best of my knowledge and belief, true, accurate, and complete.

H.  Informal Meet and Confer Regarding Annual Reports. If Plaintiffs have questions regarding information provided in the Annual Report, the Parties agree to informally meet and confer on a mutually agreed upon schedule in an effort to resolve any such questions.

## VI.  REIMBURSEMENT OF COSTS AND STIPULATED PENALTIES

31.  Reimbursement of Litigation Fees and Costs. To effectuate settlement, and without any admission of fact or law, SDG&E agrees to reimburse Plaintiffs the amount of $302,500.00 to defray Plaintiffs' claimed investigative, expert, consultant, and attorneys' fees and costs

incurred through the Effective Date, including all fees and costs incurred investigating the activities at the Facilities, preparing the Notice Letter and Complaint, litigating this matter, and negotiating a resolution of this Action. Such payment shall be made by check payable to "Environmental Advocates" and remitted to the firm at 5135 Anza Street, San Francisco, California, 94121, within sixty (60) Days after the Effective Date  provided Plaintiffs provide SDG&E, within 14 Days of the Effective Date, a current IRS Form W-9 for Environmental Advocates. Should SDG&E not receive a current Environmental Advocates IRS Form W-9 for Environmental Advocates within 14 Days of the Effective Date, the payment required by this Paragraph 31 shall be extended for each additional Day beyond the 14 Days of the Effective Date until SDG&E receives the required tax information.  Plaintiffs otherwise waives and releases any and all additional claims for litigation fees and costs prior to the Termination Date and covenants not to sue or otherwise pursue any judicial action to recover or seek additional litigation costs excepting any fees and cost incurred in any judicial dispute resolution as provided for in this Consent Decree.

32.     Oversight Costs. Within sixty (60) Days of the Effective Date, SDG&E shall pay Plaintiffs the sum of sixty thousand dollars ($60,000). Payment by SDG&E shall be made by check to Environmental Advocates and remitted to the firm at 5135 Anza Street, San Francisco, California, 94121 provided Plaintiffs provide SDG&E, within 14 Days of the Effective Date, a current IRS Form W-9 for Environmental Advocates. Should SDG&E not receive a current Environmental Advocates IRS Form W-9 for Environmental Advocates within 14 Days of the Effective Date, the payment required by this Paragraph 32 shall be extended for each additional Day beyond the 14 Days of the Effective Date until SDG&E receives the required tax information. The amounts paid to Plaintiffs pursuant to this Paragraph 32 shall be the sole payment made by SDG&E to Plaintiffs for oversight of this Consent Decree between the Effective Date and the Termination Date. Plaintiffs otherwise waive and release any and all additional claims for oversight costs prior to the Termination Date and covenants not to sue or otherwise pursue any judicial action to recover or seek additional oversight costs.

33.     Stipulated Penalties.

27

A.      SDG&E shall pay stipulated penalties in accordance with this Paragraph 33 for any failure to (1) timely submit payment as required under Paragraphs 31 (Reimbursement of Litigation Costs) and 32 (Oversight Costs), or (2) timely submit an Annual Report as required under Paragraph 30.

B.      No stipulated penalties shall begin to accrue until five (5) Days after Plaintiffs provide SDG&E with written notice of a failure to (1) timely submit payment as required under Paragraphs 31 (Reimbursement of Litigation Costs) and 32 (Oversight Costs), or (2) timely submit an Annual Report as required under Paragraph 30.

C.      Provided SDG&E does not cure its failure to (1) timely submit payment as required under Paragraphs 31 (Reimbursement of Litigation Costs) and 32 (Oversight Costs), or (2) timely submit an Annual Report as required under Paragraph 30, within the five (5) Day time period, stipulated penalties shall accrue at a rate of $750.00/day for each noncompliance beginning on the sixth Day after receipt of the required notice until SDG&E cures the noncompliance or SDG&E triggers dispute resolution in accordance with Section VIII (DISPUTE RESOLUTION AND ENFORCEMENT OF CONSENT DECREE).

D.      Following SDG&E's curing of any noncompliance, 30 Days after SDG&E receives a current IRS W-9 Form for the Rose Foundation for Communities and the Environment, SDG&E shall pay any stipulated penalties owed. Any stipulated penalties owed shall be payable to the Rose Foundation for Communities and the Environment to fund the projects related to water quality and/or riparian habitat protection or enhancement efforts in the SDG&E service area, and SDG&E shall provide Plaintiffs with proof of such payment within five (5) Days of making the payment. Payment shall be made by sending a check via certified mail or overnight delivery as follows:  Rose Foundation, ATTN:  Ecological Rights Foundation v.  SDG&E, 201 4th Street, Suite 102, Oakland, California 94607.

E.      Should SDG&E dispute a claim of non-compliance related to timely submittal of any Annual Report as required under Paragraph 30, and trigger dispute resolution in accordance with Section VIII (DISPUTE RESOLUTION AND ENFORCEMENT OF CONSENT DECREE), the accrual of stipulated penalties pursuant to this Paragraph 33 shall be

tolled pending resolution of the Dispute (as defined in Paragraph 35 below).

## VII.  **TECHNICAL DISPUTE RESOLUTION**

34.     Technical dispute resolution shall only apply in those circumstances where specifically identified in this Consent Decree, and in any dispute in which the Parties subsequently agree in writing that a technical dispute should be appropriately resolved by this Technical Dispute Resolution process. In all other circumstances where there is a Dispute (as defined in Paragraph 35 below), the dispute resolution and enforcement process set forth in Section VIII (DISPUTE RESOLUTION AND ENFORCEMENT OF CONSENT DECREE) shall apply. Technical dispute resolution shall proceed as follows:

A.     Unless the Parties mutually agree otherwise, the Parties shall schedule an informal meet and confer to occur within ten (10) Days of Plaintiffs' notice of disagreement (or such other date as mutually agreed upon) to discuss the technical dispute.

B.     If the informal process does not result in a resolution, either Party may trigger a Technical Peer Review Process by providing written notice to the other Party within seven (7) Days of the conclusion of the informal meet-and-confer process or an agreement not to meet-and-confer. The Technical Peer Review Process shall be performed by three consultants, at SDG&E's expense, selected as follows: (i) a consultant selected by Plaintiffs; (ii) a consultant selected by SDG&E; and (iii) a consultant mutually selected by the two other consultants (the "Panel"). SDG&E's agreement to pay each consultant is conditioned upon the consultant charging a reasonable market rate for California for the type and scope of work being performed pursuant to this Consent Decree. Each consultant on the Panel shall have relevant experience with Dioxins and shall have an advanced degree reasonably related to the relevant issues, such as engineering, chemistry, geology, hydrogeology, or other similar field. The Panel shall review the issue(s) subject to the technical dispute and shall, by majority vote, either approve, modify, or reject the technical issue presented. The decision of the Panel shall be final and is not subject to the dispute resolution provisions in Section VIII of this Consent Decree. Unless an alternative schedule is mutually agreed by the Parties, the Panel shall provide the Parties with a written report supporting their decision within sixty (60) Days of the selection of all three consultants.

During the technical review process, the Panel shall be able to request reasonable information from the Parties (provided that it is in the reasonable possession or control of the Party and does not require additional sampling or other field work, or seek privileged information) relevant to its analysis. If the Panel requests any such information, the request shall be provided to both Parties and both Parties shall have the opportunity to provide responsive information. The Panel (and the individual panelists) shall not, however, have any ex parte communications with the Parties regarding the subject of the Dispute prior to completing its written report.

VIII.   **DISPUTE RESOLUTION AND ENFORCEMENT OF CONSENT DECREE**

35.     Unless otherwise specifically specified by this Consent Decree, if a dispute under this Consent Decree arises or any Party believes that a breach of this Consent Decree has occurred (collectively, a "Dispute"), prior to the Termination Date, the Party raising the Dispute shall give written notice describing the nature of the Dispute to the other Parties ("Dispute Notice"). Such Dispute Notice must be provided no later than ninety (90) Days after a Party has actual knowledge of the relevant facts giving rise to the Dispute. If less than ninety (90) Days remain prior to the Termination Date, such Dispute Notice must be provided no later than two (2) Days after a Party has actual knowledge of the relevant facts giving rise to the Dispute. Resolution of a particular Dispute, if timely noticed and prosecuted in accordance with the procedure and time schedule set forth in this Paragraph 35 shall, if necessary, extend beyond the Termination Date, but shall not otherwise act to extend the Termination Date for any matter not subject to the particular Dispute.

A.      Within fourteen (14) Days of delivering the Dispute Notice to the other Parties, or as soon as reasonably achievable thereafter as agreed by the Parties, the Parties shall meet and confer about whether a breach has occurred and, if needed, develop a mutually agreed upon plan, including implementation dates, to resolve the Dispute. Such a plan can include, but is not required to include, an agreement to engage in a mediation process—including retention of a mediator—in an effort to resolve the Dispute. Each Party shall be responsible for its own attorneys' fees and costs during the meet and confer dispute resolution process, except as provided by Subparagraph 35(B), below.

B.      If the Parties fail to timely meet and confer, or the meet-and-confer does not resolve the Dispute, after (i) at least seven (7) Days have passed after the meet- and-confer occurred, or (ii) twenty one (21) Days after delivery of the Dispute Notice to the other Parties, whichever is later, any Party may file a motion with the District Court for the limited purposes of enforcement of the terms of this Consent Decree or resolution of any Dispute otherwise arising under the terms of this Consent Decree. No Party shall be entitled to file such motion unless it has provided a Dispute Notice and used best efforts to meet and confer in good faith as provided in Subparagraph 35(A). In any judicial dispute resolution proceeding between the Parties in connection with this Consent Decree and consistent with this Subparagraph 35(B), the prevailing Party shall be entitled to seek its reasonable attorneys' fees and costs in such proceeding pursuant to the standards set forth by 42 U.S.C. § 6972(e) and associated applicable case law. When responding to a motion seeking attorneys' fees and/or costs, a Party is not precluded from asking the Court to consider its offers made in an attempt to resolve the Dispute prior to seeking the involvement of the Court consistent with any relevant limitation pursuant to the Federal Rules of Civil Procedure and the Local Rules.

## IX.    WAIVER, RELEASE, AND COVENANT

36.    Plaintiffs' Waiver and Release. Upon the Effective Date of this Consent Decree and through and including the Termination Date, Ecological Rights Foundation ("EcoRights") and San Diego Coastkeeper ("SDCK"), on their own behalf and on behalf of board members, subsidiaries, predecessors, successors, assigns, directors, officers, agents, attorneys, representatives, and employees (collectively, the "EcoRights and SDCK Releasing Parties"), hereby forever release and discharge SDG&E and each of its officers, directors, present and former employees, agents, attorneys, consultants, shareholders, members, parents, subsidiaries, predecessors, successors, assigns, affiliates, and each of their respective heirs, successors, assigns, present and former employees, agents, attorneys, consultants, and other representatives (each a "Released Defendant Party") from and waive all claims in the Action and which arise from or could have arisen from the application of the CWA, RCRA, or other law to the common nucleus of facts alleged in the Notice Letter (excluding the North East Annex site) and/or Complaint,

including, without limitation, all claims for injunctive relief, damages, penalties, fines, sanctions, mitigation, fees (including without limitation, fees of attorneys, experts, and others), costs, expenses or any other sum incurred or claimed or which could have been claimed.

37.     SDG&E's Waiver and Release. Upon the Effective Date of this Consent Decree and through and including the Termination Date, SDG&E releases the EcoRights and SDCK Releasing Parties from and waives all claims in the Action, including without limitation, all claims for fees (including fees of attorneys, experts, and others), costs, expenses or any other sum incurred or claimed or which could have been claimed in the Action.

38.     Plaintiffs' Covenant Not to Sue. Except for the enforcement of this Consent Decree, beginning on the Effective Date and terminating on the Termination Date (or, as applicable to any Facility, partial termination pursuant to Paragraph 41), the EcoRights and SDCK Releasing Parties shall not serve any notice of intent to sue nor file any lawsuit against SDG&E and/or a Released Defendant Party under any federal, State, or local environmental laws in connection with the claims released by the EcoRights and SDCK Releasing Parties in this Consent Decree. Any notice of intent to sue or lawsuit filed by EcoRights and SDCK Releasing Parties after the Termination Date shall not include any such claims occurring in the time period through and including the Termination Date.

39.     With respect to the matters released in Paragraphs 36 and 37, the Parties acknowledge that they are familiar with section 1542 of the California Civil Code, and knowingly waive all provisions of section 1542 of California Civil Code, to the extent applicable. Section 1542 provides as follows:

> A general release does not extend to claims that the creditor or releasing party does not know or suspect to exist in his or her favor at the time of executing the release and that, if known by him or her, would have materially affected his or her settlement with the debtor or released party.

The Parties recognize they may hereafter discover facts in addition to or different from those which they now know or believe to be true with respect to the subject matter of the released claims in Paragraphs 36 and 37, but the Parties will have fully, finally, and forever settled and released any and all such claims, known or unknown, suspected or unsuspected, contingent or

non-contingent, whether or not concealed or hidden, which now exist, or heretofore have existed, without regard to the subsequent discovery or existence of such different or additional facts.

## X.  **PARTIAL OR FULL TERMINATION**

40.     Except as provided for in this Section X, the Consent Decree shall terminate on the Termination Date.

41.     <u>Early Termination for Individual Facilities</u>. Prior to the Termination Date, the requirements of this Consent Decree shall terminate as to any Facility thirty (30) Days after one or more of the following circumstances described in Subparagraphs 41(A), (B), or (C) ("Termination Criteria") occurs.

A.     SDG&E provides written notice to Plaintiffs that it has ceased all storage, cutting, and handling of pentachlorophenol-treated wood poles and TWW at a Facility and, as appropriate, sweeps, cleans, and power-washes the former Pole Area(s) and the area(s) where the TWW storage bins were located prior to cessation. If SDG&E resumes storage of pentachlorophenol-treated wood poles or TWW at the Facility prior to the Termination Date, the terms of this Consent Decree shall once again apply to the Facility until the Termination Date or until one or more of the Termination Criteria is met.

B.     SDG&E provides written notice to Plaintiffs that it has closed the Facility and, as appropriate, sweeps, cleans, and power-washes the former Pole Area(s) and the area(s) where the TWW storage bins were located prior to closure. If SDG&E reopens the Facility prior to the Termination Date, the terms of this Consent Decree shall once again apply to the Facility until the Termination Date or until one or more of the Termination Criteria is met.

C.     As to any one or more Facilities where, on or after the fifth anniversary of the Effective Date, SDG&E provides Plaintiffs with an Annual Report as required by Paragraph 30 which demonstrates that it has (i) implemented the Source Control BMP, the Existing Facilities' BMP, or Structural/Treatment BMP, and (ii) completed two rounds of consecutive stormwater sampling and implemented Sampling Best Efforts as required under the terms of this Consent Decree for the Source Control BMP (as provided in Subparagraph 16(A)), the Existing Facilities' BMP (as provided in Paragraph 20), the Infiltration Treatment/Structural BMP (as

provided in Subparagraph 21(A)(i)), and the Filtration Treatment/Structural BMP (as provided in Paragraph 21(E)(i)).

42.    <u>Early Termination of Consent Decree</u>. The Consent Decree shall terminate in its entirety on the fifth anniversary of the Effective Date in the event SDG&E has (i) implemented the Source Control BMP, the Existing Facilities' BMP, or Structural/Treatment BMP, (ii) completed two rounds of consecutive stormwater sampling and implanted Sampling Best Efforts as required under the terms of this Consent Decree for the Source Control BMP (as provided in Subparagraph 16(A)), the Existing Facilities' BMP (as provided in Paragraph 20), the Infiltration Treatment/Structural BMP (as provided in Subparagraph 21(A)(i)), and the Filtration Treatment/Structural BMP (as provided in Paragraph 21(E)(i)), and (iii) submitted an Annual Report, as otherwise required by Paragraph 30, stating that early termination pursuant to this Paragraph is warranted.

## XI.    **MISCELLANEOUS PROVISIONS**

43.    <u>No Admission</u>. The Parties enter into this Consent Decree for the purpose of avoiding prolonged and costly litigation. Nothing in this Consent Decree shall be construed as, and SDG&E expressly does not intend to imply, an admission as to any fact, finding, issue of law, or violation of law, nor shall compliance with this Consent Decree constitute or be construed as an admission by SDG&E of any fact, finding, conclusion, issue of law, or violation of law. However, this Paragraph 43 shall not diminish or otherwise affect the obligation, responsibilities, and duties of the Parties under this Consent Decree.

44.    <u>Confidential Information</u>.

A.    The Parties recognize that this Consent Decree requires or contemplates that the Parties will exchange certain information pertaining to the implementation, compliance with, or oversight of the terms in the Consent Decree and which is generated in connection with the terms of the Consent Decree. In accordance with Subparagraph 30(E), SDG&E shall provide a summary of activities undertaken each year in a non-confidential section of each Annual Report that Plaintiffs shall be entitled to use at their discretion. Any other information received by a Party pursuant to this Consent Decree from another Party, including but not limited to Stormwater

Facility maps and all stormwater sampling data, photographs and video taken by Plaintiffs during previous on-site inspections or inspections pursuant to Paragraph 28 shall be considered "Confidential Information" and shall be subject to the limitations in this Paragraph 44.

B.      Plaintiffs may inform their attorneys, consultants, officers, boards of directors, and members whether SDG&E's analysis of stormwater samples performed pursuant to this Consent Decree or any other information indicates that it has reduced Pollutant levels in stormwater runoff to Pollutant Action Levels, Facility-specific Pollutant Action Levels or Infiltration BMP Pollutant Action Levels. To the extent that Plaintiffs communicates this information to its attorneys, consultants, officers, boards of directors, or members, Plaintiffs shall remind its attorneys, consultants, officers, boards of directors, or members that such information is Confidential Information and must be handled in accordance with the requirements of this Paragraph 44.

C.      In any dispute resolution proceeding, to the extent that Confidential Information is material to the dispute, Plaintiffs may provide the Court or Technical Review Panel with the results of SDG&E's analysis of stormwater samples performed pursuant to this Consent Decree. When filing Confidential Information with the Court, Plaintiffs shall request leave from the Court to file the Confidential Information under seal and if leave is granted, shall only file this material under seal. If the Court denies leave to file Confidential Information under seal, and further indicates it will not admit the information into evidence unless it is publicly filed in a manner that reveals its source, Plaintiffs shall be allowed to file this information, provided SDG&E has first had the opportunity to avail itself of all possible procedures available under the Federal Rules of Civil Procedure, Local Rules and Court-specific rules. When providing Confidential Information to the Technical Review Panel, Plaintiffs shall require the Technical Review Panel to manage any such Confidential Information in accordance with this Paragraph 44.

D.      Plaintiffs may provide anonymized sampling information to third parties, provided that use of such data is independent of any claims (or potential claims) against SDG&E, and the scope of information disclosed is limited to anonymized sampling data reported in connection with implementation of a Source Control BMP, Existing Facilities BMP,

Treatment/Structural BMP or an approved Alternative BMP Proposal pursuant to Paragraphs 16, 20, 21 or 23. In the event Plaintiffs intends to provide such data to any third party, or intends to use it in a future judicial proceeding, it shall provide a copy of the anonymized information, to SDG&E seven (7) Days prior to delivering the information to any third party or including the information in a judicial proceeding. In the event that SDG&E objects to the form or nature of the anonymized information, Plaintiffs shall not provide the information to any third-party or include the information in a judicial proceeding until such Dispute is resolved via the dispute resolution process in Section VIII or by Court order.

       E.     Under no circumstances shall Plaintiffs provide non-anonymized sampling information to a third party or use non-anonymized sampling information in any judicial proceeding, except in a proceeding related to enforcement of the Consent Decree. Should Plaintiffs seek to use the non-anonymized sampling information (i.e., a subset of Confidential Information) in a judicial proceeding to enforce the Consent Decree, Plaintiffs shall request leave from the Court to file the non-anonymized sampling information under seal and if leave is granted, shall only file this material under seal. If the Court denies leave to file non-anonymized sampling information under seal, and further indicates it will not admit the information into evidence unless it is publicly filed in a manner that reveals its source, Plaintiffs shall be allowed to file this information, provided SDG&E has first had the opportunity to avail itself of all possible procedures available under the Federal Rules of Civil Procedure, Local Rules and Court-specific rules.

       F.     The Parties agree that, subject to the exceptions in this Paragraph 44, Confidential Information shall not be disclosed to any other person and only be used by a Party for the purpose of implementing, complying with, or overseeing the terms of this Consent Decree (which shall include sharing such Confidential Information with counsel, consultants, experts, laboratories, and contractors, or similar entities, provided that they are acting on behalf of a Party for the purpose of implementing, complying with, or overseeing this Consent Decree). Notwithstanding the foregoing, nothing herein shall restrict SDG&E's right to share its own information as it deems appropriate. The Parties shall (i) keep all Confidential Information, and

all information and evaluations derived from such Confidential Information, in confidence using a

reasonable degree of care to prevent disclosure to unauthorized third-parties; (ii) limit use of

Confidential Information as specified in this Paragraph 44; (iii) only reproduce or disseminate

Confidential Information of another Party to the extent necessary and as permitted by this

Consent Decree; and (iv) promptly inform the other Party, in writing, of any unpermitted release

or sharing of or request, including pursuant to judicial process, for, the Confidential Information.

45.     The obligations of confidentiality with respect to Confidential Information shall

not apply to any such Confidential Information which (i) is publicly known or later made public

through no wrongful or negligent act of the receiving and/or disclosing Party; (ii) is received free

of restriction on disclosure from another source having the right to so furnish the Confidential

Information; (iii) is used or disclosed in connection with enforcement of this Consent Decree and

subject to a protective order entered by the District Court; (iv) is approved for release in writing

by the Parties; or (v) is required to be disclosed by operation of law, subject to notice reasonably

prior to the disclosure.

46.     Permitting Force Majeure.  If Plaintiffs intervenes in any regulatory permitting

process pursued by SDG&E needed to meet the requirements of the Source Control BMP

described in Subparagraphs 16(B), 16(F), 16(G) or 16(J), the Existing Facilities' BMPs described

in Paragraphs 19 or 20 the Treatment/Structural BMPs described in Paragraph 21, or an

Alternative BMP Proposal approved pursuant to Paragraph 23, by submitting comments, seeking

a meeting with regulators, or otherwise—any resulting delay shall be a Force Majeure event

(pursuant to Paragraph 47) provided that SDG&E was otherwise diligently pursuing such permits.

47.     Force Majeure. No Party shall be considered to be in default in the performance of

any of its obligations when a delay of performance or failure to perform is due to a "Force

Majeure event." A Force Majeure event is any unforeseeable event or circumstance which is not

caused by a material act or omission of a Party, which results in any delay in, or total or partial

failure of, performance of the affected Party after that Party has exercised due diligence to

remedy, avoid or limit the impact of the event, including, without limitation, any act of God, war,

fire, earthquake, flood, pandemic, weather event, social unrest, health emergency, restraint by

court order or public authority, and/or delay caused by a regulatory or government agency for reasons outside the control of a Party. A Force Majeure event does not include normal inclement weather or inability to pay.

48.     Binding on the Parties. The terms of this Consent Decree shall be binding on all Parties and their employees, officers, members, shareholders, attorneys, agents, divisions, subsidiaries, parent corporations, affiliates, successors in interest including subsequent purchasers, and assignees.

49.     Counterparts. This Consent Decree may be executed in one or more counterparts which, taken together, shall be deemed to constitute one and the same document. An executed copy of this Consent Decree shall be valid as an original.

50.     Severability. In the event that any one of the provisions of this Consent Decree is held by a court to be unenforceable, the validity of the enforceable provisions shall not be adversely affected.

51.     Authority to Enter Agreement. The undersigned are authorized to execute this Consent Decree on behalf of its respective Party and have read, understood and agreed to be bound by all of the terms and conditions of this Consent Decree.

52.     Integration. All agreements, covenants, representations and warranties, express or implied, oral or written, of the Parties concerning the subject matter of this Consent Decree are contained herein. This Consent Decree and the attachments contain all of the terms and conditions agreed upon by the Parties relating to the matters covered by the Consent Decree, and supersede any and all prior and contemporaneous agreements, negotiations, correspondence, understandings and communications of the Parties, whether oral or written, respecting the matters covered by this Consent Decree. This Consent Decree may be amended or modified only by a writing signed by the Parties or its authorized representatives.

53.     Agreement for the Benefit of the Parties. This Consent Decree and its attachments are made for the sole benefit of the Parties, and no other person or entity shall have any rights or remedies under or by reason of this Consent Decree, unless otherwise expressly provided for therein.

54.     <u>Notices</u>. Any notices or documents required or provided for by this Consent Decree or related thereto that are to be provided to Plaintiffs pursuant to this Consent Decree shall be sent by electronic mail transmission (including attachments and/or download links) to the following email addresses:

> Fredric Evenson
> Ecology Law Center
> evenson@ecologylaw.com

With copies sent to:

> Christopher Sproul
> Environmental Advocates
> csproul@enviroadvocates.com

> Patrick McDonough
> San Diego Coastkeeper
> patrick@sdcoastkeeper.org

Any notices or documents required or provided for by this Consent Decree or related thereto that are to be provided to SDG&E pursuant to this Consent Decree (including attachments) shall be sent by U.S. Mail, postage prepaid, and addressed as follows or, in the alternative, shall be sent by electronic mail transmission (including attachments and/or download links) to the email addresses listed below:

If to SDG&E:

> David A. Speaker
> San Diego Gas & Electric Company
> 8330 Century Park Ct., CP32B
> San Diego, CA 92123
> dspeaker@sdge.com

With copies sent to:

> J. Tom Boer
> Hogan Lovells US LLP
> 4 Embarcadero Center, Suite 3500
> San Francisco, CA 94111
> tom.boer@hoganlovells.com

Each Party shall promptly notify the other of any change in the above-listed contact information. Any notice provided under this Consent Decree shall be deemed received on the Day it is emailed if sent by email and received three (3) Days after the date of mailing if sent by United States mail.

55.     Electronic Signatures. Signatures of the Parties transmitted by facsimile or email shall be deemed binding.

56.     Court Approval. If for any reason the District Court should decline to approve this Consent Decree in the form presented, the Parties shall use their best efforts to work together to modify the Consent Decree to address any deficiency or other objection identified by the District Court within thirty (30) Days so that it is acceptable to the District Court. If the Parties are unable to modify this Consent Decree in a mutually acceptable manner, this Consent Decree shall become null and void.

57.     Representation by Counsel. This Consent Decree shall be deemed to have been drafted equally by the Parties and shall not be interpreted for or against any Party on the ground that any such Party drafted it. Each of the Parties agrees that it has been represented by independent counsel of its choice during the negotiation of this Consent Decree and has had the opportunity to review the provisions of the Consent Decree with its independent counsel in advance of execution.

58.     Integration and Amendment.  This Consent Decree and the attachments contain all of the terms and conditions agreed upon by the Parties relating to the matters covered by the Consent Decree, and supersede any and all prior and contemporaneous Consent Decrees, negotiations, correspondence, understandings and communications of the Parties, whether oral or written, respecting the matters covered by this Consent Decree. This Consent Decree may be amended or modified only by a writing signed by the Parties or their authorized representatives.

59.     Heading and Captions. The headings and captions used in the Consent Decree are for reference purposes only and shall not have any effect on the interpretation of the Consent Decree.

Ecological Rights Foundation

Date: 9/6/2024 _____    By: _Linda Sherby_____

                                     Linda Sherby

                                     San Diego Coastkeeper

Date:_____    By:_____

55.  <u>Electronic Signatures</u>. Signatures of the Parties transmitted by facsimile or email shall be deemed binding.

56.  <u>Court Approval</u>. If for any reason the District Court should decline to approve this Consent Decree in the form presented, the Parties shall use their best efforts to work together to modify the Consent Decree to address any deficiency or other objection identified by the District Court within thirty (30) Days so that it is acceptable to the District Court. If the Parties are unable to modify this Consent Decree in a mutually acceptable manner, this Consent Decree shall become null and void.

57.  <u>Representation by Counsel</u>. This Consent Decree shall be deemed to have been drafted equally by the Parties and shall not be interpreted for or against any Party on the ground that any such Party drafted it. Each of the Parties agrees that it has been represented by independent counsel of its choice during the negotiation of this Consent Decree and has had the opportunity to review the provisions of the Consent Decree with its independent counsel in advance of execution.

58.  <u>Integration and Amendment</u>.  This Consent Decree and the attachments contain all of the terms and conditions agreed upon by the Parties relating to the matters covered by the Consent Decree, and supersede any and all prior and contemporaneous Consent Decrees, negotiations, correspondence, understandings and communications of the Parties, whether oral or written, respecting the matters covered by this Consent Decree. This Consent Decree may be amended or modified only by a writing signed by the Parties or their authorized representatives.

59.  <u>Heading and Captions</u>. The headings and captions used in the Consent Decree are for reference purposes only and shall not have any effect on the interpretation of the Consent Decree.

Ecological Rights Foundation

Date:_____    By:_____


San Diego Coastkeeper

Date:_ 09/07/2024 ____    By: _Phillip Musegaas_
                              *Phillip Musegaas*

40

1

2
Date: September 3, 2024

San Diego Gas & Electric Company

3
By: _____ DRS

4

5
Approved as to Form:

6
Ecology Law Center

7
Date: Serptember 9, 2024
By: *Fredric Evenson*

8
Fredric Evenson

9
Attorney for Plaintiffs Ecological Rights Foundation

10
and San Diego Coastkeeper

11

12
Hogan Lovells US LLP

13
Date: September 3, 2024
By: _____

14
J. Tom Boer

15
Attorney for Defendant San Diego Gas & Electric

16
Company

17

18

19

20

21

22

23

24

25

26

27

28

41

1

2

3

**EXHIBIT A**

**SDG&E FACILITIES SUBJECT TO THE CONSENT DECREE**

4

5

5016 Carlsbad Blvd.
Carlsbad, CA 92008
(aka "North Coast")

6

7

6875 Consolidated Way
San Diego, CA 92121
(aka "Miramar")

8

9

104 N Johnson Ave.
El Cajon, CA 92020
(aka "Eastern")

10

11

571 Enterprise St.
Escondido, CA 92029
(aka "North East")

12

13

735 33rd St,
San Diego, CA 92102
(aka "Metro")

14

15

110 14th St.
Ramona, CA 92065
(aka "Ramona")

16

17

18

19

20

21

22

23

24

25

26

27

28

**EXHIBIT B**

**FACILITY-SPECIFIC DILUTION FACTORS**

| Facility Name | Pole Area Type | Calculated Dilution Factor[1] |
|---|---|---|
| North Coast | Pole and Crossarm | 210 |
| North East | Crossarm | 460,000 |
| Ramona | Crossarm | N/A[2] |
| Miramar | Pole | 260 |
| Metro | Pole | 150 |
| Metro | Crossarm | 950 |
| Eastern | Pole and Crossarm | 27,000 |

[1] Dilution Factor is the ratio of (i) runoff volume to a receiving water generated by the entire drainage area in which a facility is located, to (ii) the runoff volume generated by the Pole Area at the Facility. Dilution factor is unitless.

[2] Stormwater runoff from the Pole Area is treated by an infiltration BMP designed for infiltration of at least the stormwater runoff volume generated in the 85th percentile, 24-hour storm, event per County of San Diego post-construction BMP design requirements (County of San Diego, 2020). Therefore, no stormwater discharges are expected from the Pole Area during storm events up to the Design Storm.

Reference:

County of San Diego, 2020. *Best Management Practice Design Manual for Permanent Site Design, Stormwater Treatment, and Hydromodification Management.* Stormwater Requirements for Development Applications. Effective September 15, 2020. Watershed Protection Program, County of San Diego. www.sandiegocounty.gov.

# EXHIBIT C

## Dioxins TEQ Equation, Toxicity Equivalency Factors and Bioaccumulation Equivalency Factors

*Dioxins TEQ = $\Sigma(C_X \times TEF_X \times BEF_X)$*

Where,
$C_X$ = concentration of dioxin or furan congener x
$TEF_X$ = TEF for congener x
$BEF_X$ = BEF for congener x

| Congener | Great Lakes Water Quality Initiative Bioaccumulation Equivalency Factors (BEF) | 2005 World Health Organization (WHO) Toxic Equivalency Factors (TEF) |
|---|---|---|
| 1,2,3,4,6,7,8-HpCDD | 0.05 | 0.01 |
| 1,2,3,4,6,7,8-HpCDF | 0.01 | 0.01 |
| 1,2,3,4,7,8,9-HpCDF | 0.4 | 0.01 |
| 1,2,3,4,7,8-HxCDD | 0.3 | 0.1 |
| 1,2,3,4,7,8-HxCDF | 0.08 | 0.1 |
| 1,2,3,6,7,8-HxCDD | 0.1 | 0.1 |
| 1,2,3,6,7,8-HxCDF | 0.2 | 0.1 |
| 1,2,3,7,8,9-HxCDD | 0.1 | 0.1 |
| 1,2,3,7,8,9-HxCDF | 0.6 | 0.1 |
| 1,2,3,7,8-PeCDD | 0.9 | 1 |
| 1,2,3,7,8-PeCDF | 0.2 | 0.03 |
| 2,3,4,6,7,8-HxCDF | 0.7 | 0.1 |
| 2,3,4,7,8-PeCDF | 1.6 | 0.3 |
| 2,3,7,8-TCDD | 1.0 | 1 |
| 2,3,7,8-TCDF | 0.8 | 0.1 |
| OCDD | 0.01 | 0.0003 |
| OCDF | 0.02 | 0.0003 |

44